Good morning, Your Honors. May it please the Court, Minda Schechter, Counsel for Appellant International Norcent Technology. With the Court's permission, I'd like to reserve five minutes. Whatever you've got on the clock. Okay. Fair enough. At the outset, I'd just like to confirm that this is not a patent pooling case. It's not about conscious parallelism. And it's not about multiple conspiracies. In this case, ten companies got together, excluded everybody else in the industry, set a standard not for the benefit of consumers, not for the benefit of the industry, but to eliminate competition between themselves, assure that they would have patent coverage, which would then give them dominance in the market. They succeeded in this plan and, indeed, were able to drive competitors out of the market, such as Norcent. Where's your evidence of conspiracy? I'm sorry? Where's your evidence of conspiracy? You say there's a conspiracy. I mean, where is the plan? When was it? Who was party to it? Yes. When was it hatched? When was agreement reached? We have expressed allegations in the complaint of meetings in paragraph 17, for example, starting with ER 77. Okay. What's ER what? 77. 77. Okay. Okay. What's paragraph 17? 17 describes meetings of executives in September through December, 1995, in Tokyo, and additional meetings, paragraph 18, names individuals. You don't give specific dates. You don't give who was involved. I mean, this is a guess more than anything else, an information belief, additional meetings. I mean, isn't this the kind of thing that the Supreme Court said just wasn't enough in Twombly, and we then emphasize wasn't enough after Twombly? What does it say? Kendall, right? Well, we feel that Twombly is a different situation. In Twombly and in Kendall, the allegations were of parallel conduct. There was no evidence. There were no facts that would show that the parties ever met, ever got together, and, in fact, if everything in that complaint were proved, there would be no complaint. But there isn't anything here. This is saying we're guessing there must have been meetings. I mean, you're saying you phrased it a little differently, but you have no sort of specific meeting. You don't say who was present, or you just said there were somewhere meetings of executives from each member of the group of ten were held from September to December 1995 in Tokyo on information belief. Well, we have the express formation of the DVD consortium, which later became the DVD forum, paragraph 19. I mean, no one says there were meetings. It doesn't say there were meetings. I mean, they certainly are entitled to have meetings to set a standard that they will adhere to. They say, look, we're going to get together and we're going to set a standard, so we're all working on the same – we're all writing on the same page. There's nothing illegal about that, is there? Well, yes, because what we also allege is that there were organizations in the industry that could have hosted the meetings, and instead of using the industry-wide meetings, these ten companies took it upon themselves, excluded – we specifically – paragraph 13, they excluded others who wanted to participate. Paragraph 14, they excluded other technologies and alone created a standard by which everyone else had to adopt. Was your client excluded? Our client does not have technology. Our client was a victim because of the higher royalties and so forth. The market dominates when our client entered the market much later than these initial acts. Our injury does not stem from having our technology not selected. Our injury comes from the fact that prices, costs were higher in the industry, the dominance of these parties that eventually forced our client out of the market and out of business. But even if they – what's wrong with a patent pool? Well, you said this was not a patent pooling case. What's wrong with these parties getting together to put all their patents together? In the patent world, if you have a patent on a screw that goes into a multibillion-dollar machine, they try to shut down the sale of the machine because of that one little patent. So what's wrong with taking all these patents, putting them together, and then selling a technology, DVD, to the producers, the movie makers, and saying you'll be able to now have a market for your movies and we're all going to compete in the sale of the machines that play these movies? You're looking at, for example, an unfortunate purchaser of an HD DVD. And on the one hand, you buy Sony to go Blu-ray, you buy Warner Brothers to go HD DVD. What's unreasonable about that? And then you can't say that there's no – because we're all alive here, you can't say that there's no competition in the sale of these machines that play these products because you see the price drop down all the time. I think they're down about $20 now at Best Buy for some brand. Sylvania, which is not a member of this pool, I suppose Sylvania pays a patent royalty. So I don't understand why you want to say this is not patent pooling because in your complaint itself says the goal of including patents of all members of the group of 10. So why isn't this patent pooling? And if it isn't patent pooling, what's illegal about what occurred here? And why isn't that actually pro-competitive? The comment that you described, sir, I would agree is not unlawful. That's not the offense that we're challenging here. Had the industry met and all the parties picked a technology and then these parties had patents and they pooled them and asserted the pools and so forth, that would be perfectly legal. The problem here is, as we allege, there were, for example, at least two competing technologies before these parties met. If had one of those technologies been selected, then perhaps only three of the 10 companies would have had the patent dominance as opposed to all 10. So what they did was not in pooling the patents, but the step before they caused the selection of the elements of the standard to be such that they made sure that they were the ones that had the patents. So they looked at the patents and made sure some feature was in there so that they would have the dominance, have the ability. This is not a case involving capture of a standard-setting association. These are just people who get together and say, look, this is the product we're going to offer jointly. I'm just failing to understand what's anti-competitive or illegal about that. We're going to go into business together because we need all these people because to put together this product, we need all these patents in the mix because if they're not all there, we don't have this product. But when all is said and done, we come up with this product, and we'll have it compete against other technologies if this succeeds. This is not a standard-setting case. I think that it is. I think that, again, the conduct you described would not be illegal. That's not what we're alleging here. The standard-setting cases are about situations where there's an association or group that sets standards, and it's captured, and they set a particular standard, and then that excludes everybody from the market who doesn't fit the standard because you're not producing a non-conforming product. But these folks get together. They come up with technology. They don't exclude other people from marketing their technology. As you said, there were two other technologies available. They didn't say you can't sell yours. They said we'll compete ours, and if ours gains acceptance in the public, we'll win, and if it turns out one of the other technologies prevails, then all this will be wasted. Well, actually, that's not quite correct because the two preexisting technologies that we allege were the technologies controlled by these ten. So they substituted the competition between those technologies and perhaps others for a combined technology. They did not say, oh, what patents do we need to make the thing work? They got together and said, what patents do we need to make sure we have patent control? It was a reverse order, and I think that if in the standard-setting cases, you have an open forum where, like, for example, the Ally 2 case, they staffed the meeting so that the vote would be biased in favor of their position, and that's a violation, and as my colleague once framed it, as they stuffed the ballot box. In our case, they stole the ballot box, in effect. They didn't need to staff the meeting. They didn't need to have deception in the meetings, like Broadcom or Dell or whatever. They substituted themselves for an open meeting, and because they had 90% of the market and they withdrew, part of their agreement was not to produce those two competing products of technologies that existed before. Who would they sell them to? I'm sorry? Who would they sell them to? What other technologies are you talking about? The complaint mentions the MMCD. Okay, so you've got DVD, you've got MMD or whatever it is, and you have the others. Who's going to produce product for them? That's the point. By these ten market leaders agreeing that what they all will produce is a product that has all of their patents in there with 90% of the market, then the content providers are going to want discs that meet that, and disc makers make those discs, and then when someone else wants to produce another DVD player, it's no point because all the discs and so forth are made for this technology. I read your material carefully, and I still don't know what you think is anti-competitive about this, because there's competition at the player level. There's competition at the disc level because all people have access to it. I'm not sure exactly what you want. What is your ultimate goal here? You want someone else to go out and compete. They can. Someone else has another technology. Let them start using it. See if they can make contracts with the movie producers. No one's stopping them from doing that. But as a practical matter and as the cases indicate, when you have a technology standard for interoperability, if you offer another DVD player in the market, no one's going to buy it. If you're going to try to produce a different kind of disc, it has now taken on, it makes no commercial sense, so the antitrust laws do recognize commercial realities. That still doesn't answer the question. What are you suggesting? How is it going to change if you're successful in your lawsuit? How is that going to change? Well, right now the lawsuit will hopefully provide damages for parties like Norton that were injured by the conduct. The technology is advanced at this point. It's so set. I mean, technologically we won't expect a change. It's damages for the injury they caused. What stopped Norton from using its own technology, producing a machine, trying to sell it? What stopped it? Nobody would buy it because there would be no discs. If you want to play a movie and you have a Norton unique machine, why would you buy that when you have no movies to play in? The answer to your question then is you want to be part of the group of ten. No, what we want is fairness. If an allied tube, a radiant burner, a hydro level, it's an antitrust offense for certain competitors to usurp the process and take instead of an open decision as to what is the best, cheapest, maybe some technology could have been selected that wasn't patented. Maybe just one of those existing technologies would have been selected. But what happened by them taking away the choice, that itself is a violation under those standard-setting cases. By taking away the choice and then they cross-licensed each other so that everyone else in the industry had to pay royalties to three different patent pools, but the ten companies did not have to pay to any of each other so those companies had lower costs than anyone else in the market. And yes, the technology advanced and costs went down, but as the low-cost producers were forced to exit the market, prices stabilized above the levels they would have been had this conduct not taken place. So there was an anti-competitive advantage to these companies that caused some competitors to go out of the market, which caused prices to be higher than they would have been. Okay. Thank you. We're out of time. Good morning, Your Honors. My name is Douglas Melamed. I represent the Phillips Companies. I think there are two fundamental flaws in Norseman's case that I think Your Honor's question has identified both of them. First, there is nothing close to the kind of evidentiary facts that the Supreme Court requires in an antitrust case after Twombly that this Court requires in McKindle. The facts, I think, as Judge Kaczynski's colloquy made clear, that are in the complaint are themselves vague, meanings unspecified at certain times back in 1995, 14 years ago. And there's no content to any of those facts and no nexus between those facts and any plausible antitrust theory. It's important to remember one thing in this connection with the Kendall case. The Kendall case involved an allegation that the banks, who were members of the Visa and MasterCard joint ventures, conspired to fix prices, fix the price of interchange fees. There's no question that there was an agreement among the banks. It wasn't enough to avoid the pleading defects to say, gee, we know they had an agreement, therefore we can allege that the agreement included any content we might fantasize about. What the Kendall court held, what this court held in Kendall, was that the fact that there was an agreement among the parties is not sufficient. What must exist in the complaint are allegations of evidentiary facts of the specific allegedly illegal agreement, facts which if proven would establish the illegality of the agreement. And this complaint doesn't come close to proving the facts of any agreement to exclude competitors or intercompetition. The second fundamental flaw, which I think both Judge Kuczynski and Judge Kutz, your questions I think identify, is that the plaintiffs have not alleged in their complaint, have not identified in any of their papers, any act by the defendants that excluded any competition from the market. What they are talking about is something that added to competition, added to the market by bringing to the market a new specification for a new kind of product. The companies got together, pooled their know-how, pooled their patented technology, came up with a DVD specification. And then, instead of deciding the way the joint venture that developed the smart car did, for example, that only they would produce it, they said, let's open this up to the industry, we'll license others, like Norson, charging appropriate royalties, of course, to use the technology and see if this brand new standard might catch on in the marketplace. And it had to compete with CDs and VHS, and more recently with HD-DVD and with Blu-ray and with video on demand and all sorts of other technologies to find a place in the market. And that's what this is all about. This is about adding to competition. It is not about taking anything away from competition. Plaintiffs' complaint is as if my colleague, Mr. Matheson, and I were to form a law firm. We could decide, of course, quite appropriately, we want to have a law firm, we're going to have all of our specialties in that law firm, and we're not going to allow other people into our law firm. There's nothing wrong with that. That's bringing a new law firm to the market. Now, it would be a very different case, Your Honors, if we conspired with the Bar Association to wrongfully take away Ms. Schechter's license so she couldn't practice law anymore. That would be interfering with somebody else's access to the market. That's what all of the standard-setting cases that Norson cites and they're discussed in the briefs are all about. Well, are your clients, in any manner, put at a competitive advantage because they'll be sharing in royalties? I don't think they're at a competitive advantage because they're sharing royalties, except in a sense. Well, they're making money. They make money from the royalties, no question about that. That's one of the reasons they chose the license. And that's one of the reasons why they combined. Well, they combined because one of them made a left shoe, the other made a right shoe, and together they could make a pair of shoes. They had complementary assets to bring together, and they combined, and they came up with the DVD. Well, I don't know about left shoe, right shoe. Well, okay, a carburetor and transmission to make a car. This is an important point. The patent pools include only essential patents. That means you need all of them in order for the DVD to work. They're the complements to one another. They're like the carburetor and the transmission and the driveshaft and whatever else goes into a car. Well, they are getting royalties. That's correct. Are they paying? How many are there, ten of them together? When the ten get together and they pool their patents... Do they pay each other? Do they pay into a common pool? They contribute. They contribute their inventions. They spent the millions of dollars of research. Okay, they contribute their inventions. They contribute their inventions. And then they said, okay, we invented it. We'll contribute our inventions to one another, and we will let the people who contributed absolutely nothing to the invention of DVD, we'll let them in on the action, companies like Norfolk, but they're going to have to pay cash to compensate us for our invention. We're paying in kind. They're paying cash. That's the only way. And there's certainly nothing in the antitrust laws that says that a company that invents something has to somehow tax himself so that licensees who are taking advantage of his invention and who didn't do the R&D and didn't spend millions of dollars of research can somehow be on a comparable cash flow situation going forward. Well, there's nothing, there's no, there's no, Your Honor, I have searched in vain, searched in vain through three complaints, three, a briefing, an argument on three motions to dismiss in this court to determine what conduct it is of the defendants or the group of Tanner or Phillips that Norton alleges to be illegal. The only thing that comes close, I think, is Mischector referred to the fact that there were alternative technologies that existed prior to the design of the DVD standard and the suggestion was, well, somehow they put them together, maybe they best agreed to come up with the standard. Maybe that's why the standard was so successful, unlike HD DVD, which didn't prove to be so successful, although it was backed by huge electronic companies like Toshiba and Warren and others. But there's nothing wrong with putting these two technologies together. For one thing, there's no suggestion, nothing even alleged in the complaint to suggest that they could have supported two separate standards. Imagine, for example, a monopoly automobile manufacturer looks at alternative technologies for making a transmission and says, I'm going to do the best I can, I'm going to take a little of both. Having done that doesn't mean that if you hadn't done it, there would have been two different automobiles out there, because in order for that technology to become a whole different standard, you would have had to bring a great deal of other complements to bear. There's no suggestion that could have happened. There's no suggestion that those technologies were unavailable to be part of another standard if someone wanted to make it into another standard. Nor is there any allegation, and this is required in Les Shockley, in the 9th Circuit Les Shockley case, which is cited in the briefs. Nor is there any other allegation that there were so few technologies out there available for people who wanted to develop alternative standards that combining them into the DVD would somehow prevent the creation of different standards to compete. And in fact, we know that there isn't a dearth of such technologies because there's CD and BOD and Blu-ray and HD-DVD and VHS all competing with DVD. So I don't understand what it is they're complaining about, to be honest. As I say, all of the standard-setting cases, every one of them, LI2, Hydro-Level, Radiant, Brutus, Broadcom, Rambus, and Golden Bridge, every one of them have the property of taking over an industry-wide standard-setting body with the effect, on the facts in that case, with the effect of the non-competing technology, somebody else's technology, access to the market. That didn't happen here. Obviously, they can't be complaining about innovating and promoting a new standard. That's pro-competitive. That's what the antitrust is all about, encouraging companies to bring their products to market. Thank you. Well, you know, the antitrust laws ain't what they used to be. Well, in this respect, I think they're probably what they used to be in the sense that they encourage companies to invent, to innovate, to bring products to market. Yeah. Well, I'm just asking questions. Thank you. You're out of time. If you wish to have a minute for rebuttal, you may take it. Let me ask you this. Are you seeking to amend your complaint? We would appreciate the permission to amend the complaint, but we actually feel that it is the same. You've had two chances to amend, right? Right. What we feel is that this does state a claim under Twombly that Twombly inappropriately applies. Our distinction, as I've mentioned, is here we have expressed agreements, the formation of the forum. I just asked you that one question. Apparently, the answer is no. You're going to rest on your complaint, as I understand it. I'm sorry? Was your answer no to Judge Ferguson? You do not see an advantage to you? Well, we would amend the complaint to the extent to make it more clear that some of the allegations, that the facts, for example, of the meetings and so forth, are where the formation took place. It seems that there seems to be some ambiguity that where we have a paragraph that says these people met and these are the people that were there, and then a separate allegation that says they formed a forum, they did these acts, somehow it seems like it's not clear that those acts were done at those meetings and so forth. The district judge focused in on that, I think, in your second amendment complaint, third complaint. And she said all that did was talk about specific instances which were covered generally in her prior opinions. Correct? So you're just saying, well, we'll answer Judge Kozinski by giving you another date, another name, perhaps. Right? Is that what you're talking about in the amendment? Well, for example. You're not, in fact, talking about dates and names. You're just going to say at these meetings, which we believe happened, they did all these things. Yes. But I feel that. You don't have dates. You don't have specific dates. No, I mean, that's part of the insidiousness of a conspiracy. Nobody knew. We didn't know then that we were going to have to challenge it, and so we didn't. On discovery, we might get that information. And that's why I think this case should be allowed to proceed. In Twombly and Kendall, unlike the New Delhi case, if there were no meetings, if there were no factual meetings, there's no case. If they proved everything in those complaints, they would lose because there was no evidence that they ever got together. In this case, that's not true. We have the results of the meetings. So while we may not have every detail today. You say there must have been meetings because we have. Well, we know there were meetings in approximately those dates and those people. And we know that those meetings resulted in the formation of these agreements that we allege. I think that they're sufficient. If we proved everything that's in there. How do you know all this? Well, basically, we did some research before we filed the complaint. And reading from news reports at the time, there's a book, DVD, demystified, and so forth. It documents the history, the development of the DVD standard. Well, they've got agreements, so they must have had meetings. Right. And here's the point, though. When the judge first dismissed the case twice, they said, okay, we assume that they had meetings. It didn't say that. But you have these agreements. It has to be in writing. These are not a bunch of idiots over here. So it's in writing. So there were meetings. But the bottom line still becomes, so what? There were meetings. It's the agreement. Is the agreement legal or illegal? So if you go back to amend, you're going to say, well, there were more meetings. The essence of this offense is at the formation of usurping the rights to this technology. And the comments about the patent pools are really incorrect. They formed three separate patent pools. And normally in a patent pool, the patent owner might not charge each other in the pool. But in this case, they didn't charge each other even when they were in the other pools. And to say that the pools only had essential patents, that's the point. These people put their own patents in there so that they would be, quote, essential. Maybe no patent, maybe some of that technology could have been unpatented. We don't know because just as in those standard training cases, they stole this ability. You indicated, I believe, before the district court that you were ready to stand pat on your second amended complaint. Is that right? I don't recall what we said. But I think we basically, we need discovery to continue the details that you're asking. But if everything we said is true, I do think we stay the claim. So I think that Tuamli, that we meet Tuamli in a situation where you have the results of an agreement. I think that Tuamli requires all the details of the agreements when you don't know that it ever even happened. But we have the results of the agreement. So I don't think we need that here. This does have conduct that restrains trade and caused injury. Okay. Thank you. Thank you. Thank you. Can't just argue with the answer by the bell, John.
judges: Kozinski, Pregerson, Quist